Good morning. Congratulations to all of you for getting here despite the weather. And we are ready for a large... The first case consolidated is J & J Ventures Gaming LLC v. Wild, Inc. and a number of other defendants. Counsel, whenever you're ready, you may proceed. Thank you, Your Honor. May it please the Court. My name is Stephen Blonder. Together with Patrick Murphy, we represent the Solid Entertainment Gaming LLC. The act will act on this matter. The issue before this Court is whether Action Gaming, an entity which was deemed unfit and unsuitable to participate in gaming by the Illinois Gaming Board, can nonetheless profit from gaming in this state. It's logged in the policy of this state that a gaming contract is illegal, unenforceable, and void. Exceptions to that arise out of the Riverboat Gaming Act, which is incorporated into the Video Gaming Act. It's promulgated by the legislature, the establishment of the Illinois Gaming Board, to regulate gaming. The underlying policy of that act is to keep, whether it's people with mafia ties, whether it's people with association with felons, keep the undesirables, or what they call unsuitables, out of gaming in Illinois. The entire legislative framework and regulatory system is set up to accomplish that goal. If that's all true, why shouldn't this be decided by the Illinois Gaming Board instead of the courts? Because the Illinois Gaming Board promulgates regulations, and let's talk about those regulations. Now the issue for the court is whether a contract itself, that here J&J Action is trying to enforce, is in accord with those regulations. Indeed, the Gaming Board has spoken on this issue in clarifying the regulations as recently as this past summer, when they put into place under section 320 of the regulations, which states as follows. In addition to requirements set forth in the act, a use agreement, which is the only kind of gaming contract which is valid in this state and not void, must satisfy the following. A, there will only be between one, a licensed terminal operator, the beginning July 15, 2014 is licensed by the board at the time the use agreement is signed, and a licensed establishment, licensed truck seller, licensed veterans establishment, or licensed fraternal establishment. So the Gaming Board has spoken and said the only contracts that fit within the regulatory framework to be a use agreement, which again, the only contracts that are valid as a matter of law in this state, are between a licensed terminal operator who is licensed by the board at the time the contract is signed, and a licensed establishment. So to answer your question, the Gaming Board has directly spoken on this issue. And now it's up to the courts to give effect to that language. Here, in this case, we have the 777 case in the third district, and the district court here had to follow that case. It had no choice. It was the only appellate court that had spoken on the issue in 777. It was followed by the 7's case, in which Justice Schmidt, the only member of that panel who had not been on the original 777 decision, wrote a dissent which he called the decision charitably erroneous. But again, that was the purview of the appellate court. The trial court here had no choice. And the parties before the trial court said, hey, we have to follow 777. We don't really have a choice. This court, however, is not so shackled. This court can take a fresh look, and we would suggest following Justice Schmidt's decision and 7's to look at this regulation and say, this contract here is trying to be enforced with the 11 establishments. I think it's five or six underlying cases. These are void. There's nothing there. Well, it doesn't make any difference. I'm sorry. Go ahead, please. We have an affirmative obligation to determine our jurisdiction. You agree with that, don't you? I do. And it hasn't been raised in this case, and evidently it wasn't raised in the third district, and they didn't determine jurisdiction. But why wouldn't this decision about who is entitled to put VGTs in a particular establishment be within the exclusive jurisdiction of the Illinois Gaming Board? Well, the Gaming Board's job is to implement statutes. So the Gaming Board here, initially, Excel was in the venue because they look, say, you have a licensed establishment. You have a licensed operator. We have a contract that complies with Section 320 and the other requirements, and so Excel was in there. The only reason that Excel is not in these establishments today is the lower court entered a judgment that it refused to stay and forced Excel out of those ventures. So if we ask the question, what does the Gaming Board say about this? The Gaming Board initially said Excel is the one who should be there. Well, let me ask a couple questions about that. And my understanding is that when an establishment seeks a license, they have to produce all contracts they've entered into. Is that right? They have to identify to the Gaming Board contracts, and then once they get their license, the Gaming Board comes to them in time for installation and says, Who's your terminal operator? They say Excel, at which point Excel's equipment goes in there, the switch gets flipped, and the gaming goes live. Well, that's my question. You know, each of you had prior contracts with Wild. Let's talk about Wild. Top one on the docket. Before they were ever licensed, okay? Correct. When they applied for their license, they had to disclose those different contracts. And the VGTs could not be installed until that was approved by the Gaming Board. Is that correct? The VGTs couldn't be installed until the Gaming Board established that all parties were licensed, and they had to say who their terminal operator was, and they had to look at the contract. Okay, that's my question. You know, did the Gaming Board at that time choose between competing contracts? No. What the Gaming Board did was it went to the establishment and said they got to choose. They choose who's your terminal operator. They said Excel. Did J&J challenge Excel's claim in any way before the Gaming Board? No. Okay. There was nothing. The first time that this claim was challenged for the specific establishment that we're talking about was when the lawsuit was filed in the district court below, seeking a declaration that J&J's contract was somehow valid in Excel and that Excel shouldn't be there. So you would agree that by approving the installation of VGTs by Excel in Wild, the Gaming Board was not making a decision over competing contracts? That's correct. Okay. We're not suggesting in any way that the Gaming Board would have sat and analyzed different contracts, analyzed different providers or terminal operators, and say, how do we choose this one? But what they did do – Was there anything preventing the Gaming Board from making that decision at the time? Not that I'm aware of. In other words, I mean, could J&J at that time have somehow petitioned the Gaming Board and said, wait a minute, you're approving these VGTs by Excel, but we have a prior contract? Theoretically, they may have been able to, but the bottom line is they didn't. I understand. But, I mean, we have a highly regulated industry here and an administrative agency that's established by the legislature. The administrative review law applies to it. Why shouldn't this have been decided at the administrative level with only appeal rights to the courts? Well, because I don't believe under the Video Gaming Act there is a procedure for the Gaming Board to make a determination between competing claims and operators. What's crystal clear is – And they're given authority to pass all the rules and regulations necessary to regulate the gaming industry in the state. That's correct. And what's crystal clear is if the Gaming Board never anticipated you were going to have people who are deemed unsuitable for gaming, we're going to then try to sign the contracts, which are void to start with, and don't take on some new aura of validity once they get a sign. Could the Gaming Board have passed a rule or whatever and said, we're not going to honor any type of contracts by people who fail to get a license because they're unsuitable for a license? I believe that's exactly what they did. When you look at the regulations – It's certainly within their authority to do that, isn't it? It would be within their authority. But here, I think if we look at the actual regulations in place, the Gaming Board did that because what they said was a use agreement – Again, the only type of valid gaming contract as defined by the Gaming Act is between a licensed terminal operator and a licensed establishment. So they necessarily said, if you're not suitable for gaming, i.e., you can't get a license, you can't enter into a use agreement. And no one would dispute that. So taking exactly your question, the Gaming Board said that. Well, I'm still getting back to the issue of jurisdiction. We're in a situation here where I don't know how many dozens, maybe hundreds of these cases are filed across the state. The 3rd District has made a ruling. We're being asked to make a different ruling in this district. Isn't that why we have a comprehensive administrative scheme with the Illinois Gaming Board to decide this kind of issue so that you have statewide uniformity? One would certainly hope so. And here, we believe the Gaming Board did promulgate the rules and did put this into effect. The problem here is the 3rd District didn't follow it. The 3rd District, in Term 7, went off the rails and started from the proposition that while contracts are legal for gaming, and if it's not in the Video Gaming Act, it's okay, so it's not a use agreement. We can all agree on that. But they got started from the proposition that a gaming contract is valid. And that's an erroneous proposition. That's just flat out wrong. Well, if we were to determine that the Gaming Board has exclusive jurisdiction over this kind of dispute, then we would vacate the circuit court's order, dismiss the appeal. That's correct. And everything would go back to where it was before this lawsuit was filed. Why shouldn't we do that and then let the Gaming Board decide these issues? Because then we're going to be back in a situation where that will satisfy the cases in the 5th District. It will mean that this court is not going to see any more of the cases come up. But then what it does is it leaves the 777 opinion as the only appellate decision in the state ruling on the issue, which leaves us in the same position of you made a decision which is, quote, one of the members of that court, charitably, palpably erroneous, as the only opinion out there. If we don't have jurisdiction, we don't have jurisdiction. But I have pretty good, I can divine that somebody is going to try to appeal to the Supreme Court no matter what we do here. Pretty good chance of that. And hopefully there will be a situation where the 5th District will get it right and we'll be going to the Supreme Court saying the 3rd District got it wrong, the 5th District got it right, and then only the Supreme Court followed the 5th District. Because it was not palpably erroneous, and it actually looked at the principles underlying gaming in the state and furthered the public policy of the state. Justice Goldenberg, I believe you had a question for me. I'm finished. Does it make any difference to your responses to Justice Stewart that these were pre-licensure agreements? No, it doesn't. Because whether it's a pre-licensure agreement or a post-licensure agreement, it still fits within the framework of gaming in Illinois. Again, we go back to the Bedrock Principle. A contract that's not set forth in the Gaming Act is void, it's illegal. So, whenever it was signed, you know, the 3rd District came up with this distinction of use agreement versus pre-licensure agreement, and they got there by looking at the Gaming Act and saying, well, it's clearly not a use agreement because it's not between licensed establishment and licensed operator. So they then came up with this kind of other category of pre-licensure agreement. But in doing so, they ran against the policy underlying the Act and the basic promise, which is you can't contract for an illegal activity, that such a contract would be void. So that, to me, is a distinction without a difference. I mean, here, they're all use agreements. The question is whether it's a use agreement that's valid or not. If it doesn't apply to statute, it's not valid. Let's start with the presumption that the acts are legal until proven otherwise. Under those circumstances, would, and following up on Justice Stewart's question, since it involves gaming and the statutory intent of the structure of the Gaming Board is to have inclusive and exclusive jurisdiction, how does that impact the board's jurisdiction over pre-licensure agreements if they choose to assert it? Well, the board has authority over gaming in the state, and every kind of aspect of it, that's their charge and their purview. Their policy that they're supposed to uphold is to keep the unsuitables out. Right. So we start from that proposition. The board then was also charged with promulgating any rules and regulations necessary to further the act. The board then spoke, filled the bathroom, because again, before the board speaks, all of the gaming contracts are illegal on board. The board specifically defined what types of contracts are permitted. So to go to your question of the board's authority or not, the license, the board is charged with defining what's relevant, what's acceptable, what's okay, and it does that. So anything else necessarily could also fall within their jurisdiction, but they haven't defined those to be valid contracts, so therefore it's not a valid contract. Does it make any difference they haven't defined them as being invalid contracts? Well, we start from the proposition that any contract for gaming is illegal, and it's actually a Class 4 felony. But is this a contract to make a contract that becomes a viable and legal gaming contract? Is that illegal? Well, the contract here, let's take what we might call a pre-licensure agreement or a use agreement that's not valid. That language specifically contemplates in that agreement, in the agreements here, that they would be subject to the IGB, that they would have to conform to the rules and regulations of the IGB. That's in those underlying contracts. Oh, sure. So, therefore, we can't start from the proposition saying an agreement to agree, first of all, it would be an illusory contract. If there's nothing, an agreement to agree later on is wholly illusory because no one's doing anything for it. There's nothing actually happening, no change hands in that contract, there's no consideration because what there is is, well, we'll agree later to form some contract that might be valid later on. Well, there's nothing being exchanged. But secondly, the agreement that they're trying to enforce in this case is that initial agreement, which they're claiming that they had a valid use agreement with the establishment, J&J, of Actionist, and they're saying, well, you can enforce that. So it's not the situation that you're talking about, Justice Goldenherz, where it's an agreement to agree or something along those lines. The other issue here to think about when we talk about assignability and the agreement to an agree, it would be one issue if we were dealing with Action Gaming because then we'd be standing here saying, well, that can't be valid because they never got licensed. They got turned down and they filed their appeal while the appeal was pending and they tried to shift everything over to J&J for some money. Here, so then we would be having that discussion of the agreement to agree to agree and take the path down that road. We've got J&J, though, stepping into the shoes. J&J only takes an assignment of whatever Action Gaming had. Action Gaming had nothing to assign. Even if they say, well, you have an agreement to an agree or something along those lines, then that would all the action would be assigned to J&J. There's nothing they can enforce on that because it doesn't find in all the terms, using a hypothetical would be an illusory contract. So then J&J is out of luck on that ground. Either way, we get back to the situation that the only entity that had a valid contract with whether Lions, Mule Barn, any of the 11 establishments in this case was Accel. And again, the Gaming Board recognized that. When Accel entered into those agreements, was Accel already a licensed terminal operator? Yes, it was. On all of these? Yes. And then what Accel did for the eight establishments where it went live, after the establishment became licensed, it signed a new agreement with each of those establishments. So it fits within both entities were licensed, and Accel was always licensed at that point in time. In the case of Wild, at least, the new agreement was signed after the VGTs had been installed. Right. So, okay. So again, there's no issue, and we're not dealing with an assignment. We're not dealing with anything else. We're dealing with Accel, which is a licensed terminal operator, one of the largest, if not the largest in the state, and its contract with establishments, which the Gaming Board recognized in flipping the switch, letting it go live, letting the equipment be delivered. So we don't even have any issue there with the Accel contract, which, as an aside, isn't even the subject of this dispute. The issue here right now is can Action Gaming come through the back door? Well, it's not allowed to participate in gaming through the front door. Because let's kind of strip this all out. That's what this is about. That's why Mr. Gantz is going to stand up here on behalf of Action Gaming and argue that these are all valid. They're trying to protect their revenue stream. Specifically, the legislature of the Gaming Board said, you can't do this. You're not allowed to participate. So they figured, okay, let's figure out a way to circumvent that. We'll take an assignment, and all the money will come to us anyways, or whatever share they agreed to. You know, if it wasn't economically viable, they wouldn't be here. They wouldn't have a dog in this fight. They don't have a horse in this race. But this is about money. And the question becomes, can they stand here and try to enforce a contract for which they've assigned anything they had, and they're trying to profit from a system that doesn't allow them to do that? Well, the Gaming Board has since amended the minimum standards for use agreements after July 15, 2014. A terminal operator must be licensed at the time a use agreement is signed. Right. So they obviously feel they have power to regulate that issue. And that applies to all gaming contracts, all use agreements that have ever been in effect. As of July 15, both parties to the agreement had to have been licensed at the time it was signed. Why do you think the Gaming Board made that prospective from July 15? Well, the Gaming Board put the regulation in place in June and gave people several weeks. They'll give you contracts. In May, they sent out questionnaires and said, tell me about your contracts, to figure out how much time it was going to take to get new contracts in place. They put the regulation in June, effective July 15. So enemies like Accel went out and got all the contracts. Do you think it had anything to do with recognizing that the 777 case was out there? Absolutely, because if you look at that, first the Gaming Board tried to put emergency regulations in place in November of 2013. And they did two things there. They talked about license establishments, and then they also had a blacklist. JCAR took that up and rejected the emergency regs because of the blacklist issue, not because of the issue of license operator to license operator. Chairman Jaffee made multiple statements at the time of the regulations, and other members of the Gaming Board, where they said, look, this has always been the rule. We're just trying to clarify this. They didn't say in response to 777, but it comes on the heels of 777. They're essentially saying 777 got it wrong. So they're clarifying to say it's always been license to license. If you're not licensed, you can't participate. Because again, if you're going to let, and the gaming regulations reflect this, if you're going to let unlicensed people participate, whether through the operations or through the revenue stream, it throws this entire regulatory system on its head. Because if you look at the video, the Riverboat Gaming Act has been brought into the Video Gaming Act. One of the specific charges is to keep the undesirables out, keep the unsuitables out. Well, if so, I mean, this is what I keep getting back to. If the 777 court would have declined jurisdiction and said this is within the exclusive jurisdiction of the Gaming Board, this issue would have been decided statewide by the agency responsible for it, and we wouldn't have dozens of lawsuits out here. You're right. And if we go back to the 777 case and the underlying case, it would be the same result, which is the licensed operator, what I'll call the legitimate operator, was the one that was in place. The one that then got tossed out by the 777 case. Just as in this case, you have itself, the legitimate operator, the licensed operator, who had a contract with the licensed establishment getting tossed out by a judgment in the lower court. So we find ourselves in that same situation. And again, this isn't a revenue statute. I mean, gaming, yes, the state needs the revenue. That's something that we all recognize living here. But this is a statute promulgated under the police powers. It's specifically designed with the policing in mind. That's the primary policy, the primary focus. So when we look at the statute through that lens, we have to contemplate it through that lens and interpret it in that same way. To Justice Stewart, to your question, though, is if the gaming board, take the hypothetical we're here. The gaming board didn't, quote, have an administrative hearing and make these determinations. Okay? So this is a fact. Could they have? I believe they theoretically could have. Okay. What we're trying to figure out on this jurisdiction issue is why you wouldn't embrace that and go before the gaming board as, you know, opposed to having us decide this case here and have to rule differently than the third district did. Well, first of all, we didn't initiate this case. J&J and Action, I mean, let's take the real history here so we have background. There was a lawsuit in Cook County, which is still ongoing, which Action and J&J filed against Excel and a couple of other people, which started all this. That case is progressing, recognizing that they tried to do something different. So they tried to end on that case by running down state and filing 30 cases, however many it was. I think it's now up to 38 or something like that, where they didn't name some. They simply sued the establishment, figuring, hey, we can just sue the establishment, get a declaration, then we'll try to argue ratio to counter collateral estoppel somewhere up north. We tried to intervene because we found out what was going on. We said, hold on a second. We've got rights here. Our rights aren't necessarily being protected because the typical operator, they just want the machines. They don't want to be the only place on the block that doesn't have the video gaming machines and all the customers go somewhere else. So we said, hey, we've got an interest here. The district court recognized we had an interest here, let us intervene, and we then end up now in this court. So, Justice Schwamm, to answer your question, it's not that EXCEL voluntarily said, let's promulgate lawsuits all over the state and see what we can do and see how it plays out and use the court system as opposed to the administrative system to accomplish a result. We're here trying to protect our rights as a defensive position, you know, and it's what Ashton Gaming and J&J did. Again, they specifically made the notion of let's try and run down state and get a good result and then whipsaw everyone else in the state with it. So then we're left with the position, we've got a third district case that's wrong. We've got a second case in the third district in which there's a dissent where they point out why the first case was wrong. And, interestingly, in the second case, in the majority opinion, there's no analysis. They just say, well, based on race judicata, we follow Triple Seven. And then Justice Schmitt writes his dissent. And then we're in the fifth district where there's, I said, somewhere between 20 and 30 cases, and I've told there were 11 more filed in the last couple months between the fifth district and the fourth district, which are just playing themselves out in addition to the ones they filed in the first district. So, unfortunately, this is becoming an issue throughout the state. There's a whole host of lawsuits. And it all happens because you have one decision in Triple Seven which starts from the wrong place and gets to the wrong result, and every other lower court is compelled to follow it. So, to answer your question about, well, why not go to the gaming board, I think that's a question to ask Action and J&J, since they're the ones who are bringing these cases in the first place. So, if the court doesn't have any further questions, I'll reserve my time for rebuttal. Thank you. Thank you, Counsel. Counsel? Thank you, Justice Schmitt. My name is Bill Vance. I represent Action Gaming, and we're aligned, of course, with our Astony J&J, so I'm going to do most of the arguing, and he may pick up in the tail end if I leave something off. Justice Stewart, you brought up the precise question that has to be asked in this case, and that is why isn't Excel, if it is challenging the idea that our client's assignment should not be allowed and the IGB should not allow locations to put machines in based on the agreements we assign. What they're really challenging is a decision, an administrative decision of the IGB. Okay, I'm having a little trouble following you there. The IGB, let's just take the top case, Wild, approved the installation of VGTs by Excel in Wild. Right. And they only came out through your suit and TRO and so forth. Right. So, to me, the question is, why didn't you go to the IGB and say, wait a minute, Excel shouldn't get their terminals in here. We had a prior contract. Right. And Mr. Blonder properly acknowledged that the IGB isn't deciding between a terminal operator or a dispute of terminal operators. They're just going off the fact that the license location says, this is my terminal operator. They make sure both parties are licensed and that they approve. Would they have made that decision if it had been submitted to them? Absolutely not. And how do you know that? The reason for this, Your Honor, is that the IGB is an administrative agency. It has no mechanism. It's the sole body that was put in place by the legislature to regulate all video gaming operations. It's an administrative body. It also has Does it perform any adjudicatory functions? It does not. Well, it does in the sense that it decides who can be licensed. It decides who can install a VGT. And it also can decide who gets to participate. Because as they point out in their brief, if they had any objection to this entire chain of title or anyone involved, at least with respect to my client, they could have ordered disassociation. Okay? And that's a point that they brought out in their brief. The IGB has – that's the authority. But if two parties come and say, well, I have the first contract and the other one – I have the second contract and there's a commercial contractual dispute, the IGB does not have jurisdiction over that type of dispute. And that's exactly if you look at the proceedings. Yeah. I mean, really, we're in a situation here where the question is, who gets to put their VGTs in an establishment or actually a group of establishments, a whole bunch of them? Well, that – I mean, the Gaming Act was passed as a comprehensive scheme, administrative scheme, with the gaming board given authority. And if you read in the act, it's a broad authority to regulate all issues concerning gaming in the state. Why wouldn't they have authority to decide whose VGTs go in? Why couldn't they say, we're not going to honor contracts by unlicensed terminal operators who are ultimately denied a license? Because, you know, as argued by Excel, those who are not allowed to have a license are not going to be allowed to indirectly profit from the gaming industry. They could do that, couldn't they? Well, there's two questions there. The first one is, do they get to decide who gets to install VGTs at a particular location? Absolutely. They absolutely can decide that, but they don't decide it based upon a contractual dispute. They'll decide it on – Why not? Because they're not authorized to do that. They're an administrative body. If the location, for example, came in and said, I believe that the other side is in breach of the contract, they can't go to the IGB and have the IGB determine whether or not there is a breach of contract. And that's really what this case is about. The end result – Well, all decisions of the gaming board are subject to the administrative review law. You agree with that, don't you? And the proper remedy for doing that, if Excel wanted to challenge the IGB's decision about allowing an assignment, then they should have brought an action for mandamus against the IGB challenging that decision. That's the remedy. All this case is about is about the validity of a contract and the validity of an assignment. They've turned their policy argument that you should invalidate these contracts under the VGA because – the Video Gaming Act – because they think that we're unsuitable. And they try to argue the policy, but that's a different thing. If they're going to challenge that – Why do they need to take that to the gaming board if they've already got their VGTs in? Why do they need to take it to the gaming board? Why didn't you – Well, if they're going to challenge – Just a minute, I'm looking. Sure. Why didn't you take it to the gaming board and say, you know, there's an issue here. We had a prior contract with this – with Wild. Because the administrative agency has absolutely no jurisdiction or authority to decide contractual decisions. You decided that and didn't take it there, so you didn't pursue any administrative remedies. Is that right? But, Your Honor, the IGB didn't take any action about these contracts. They didn't decide the issue of breach. They didn't decide the issue of assignability. There's nothing for us – there's nothing for us to challenge. We agreed with what the IGB has done in terms of allowing this agreement to be assigned. We reported it to them. They allowed it. Okay, I'm reading from Rule 250. The duties of licensed video terminal operators are not install, remove, or relocate any video gaming terminal without prior notification and approval of the administrator or his designee. So did Excel get approval of the administrator before installing the VGTs at this – at Wild or any of these? They got approval in the sense that the location submits the use agreement that says this is my terminal operator. They did not get approval in the sense that their contract is better than ours. And if nobody challenged that approval, what else is the IGB going to do? I mean, their VGTs were approved, they were installed, and, you know, you had the opportunity at that point to somehow petition the IGB and say there's a problem here. You chose not to. No, we don't, Your Honor, because there's nothing in the Video Gambling Act that gives the IGB the authority or the power to decide a commercial contract dispute between a location and an operator. Section 40-78, Authority of the Illinois Gaming Board, Subsection A, the Board shall have jurisdiction over and shall supervise all gaming operations governed by this Act. The Board shall have all powers necessary and proper to fully and effectively execute the provisions of this Act. And it goes on. It sounds pretty broad to me. Well, the authority that's defined in Section 78 is limited to the operation of video gambling terminals, not deciding commercial disputes between competing terminal operators, not deciding commercial disputes between an operator and a licensee. It's just not in the Video Gambling Act. It's not anywhere in their procedures. If they have the right to decide these disputes, Your Honor, remember that the IGB was given sole authority to be the administrative agency to supervise and do what it felt it needed to do under the Video Gambling Act. There's not a single procedural rule under the IGB that says if you have a problem with one of our decisions, you can bring your commercial disputes to us and we'll hear it. That's not part of the Video Gambling Act. It's not part of their rules. And, frankly, it's just – there's not a single incidence that they brought to your attention where the IGB has a tribunal for this stuff. And our lawsuit was only about the validity of the contract and its assignment, not the actions taken by the IGB. That came into this case because they've argued that it's the intent of the IGB that these agreements are invalid. Well, that – I mean, we profiled and agreed that that's just not true. Both sides want us to divine what the IGB would do from statements of their counsel, rules they've passed, and so forth. And I guess my question is, if we're relying on determining what their intent is in deciding this case, why shouldn't they be deciding the case? I mean, here's the Illinois Supreme Court in People v. NL Industries to quote, Where the legislature enacts a comprehensive statutory scheme creating rights and duties which have no counterpart in common law or equity, the legislature may define the justiciable matter in such a way as to preclude or limit the jurisdiction of the circuit courts. So, I mean, one thing – we could find that this comprehensive legislative scheme vested the only gaming board with exclusive jurisdiction of all disputes. Now – but we don't even have to go that far. Let's say we determine that the courts and the gaming board have concurrent jurisdiction. Then either could decide this dispute. Then we have to follow the doctrine of primary jurisdiction and determine who should be deciding this. Is there a need for statewide uniformity? Is this an administrative agency with particular expertise in the area? And all those things would seem to lean toward this decision being made by the gaming board. Well, Your Honor, that analysis might apply. But the problem here is that there's not a single provision in the Video Gambling Act that deprives the circuit court of any authority or even suggests that the administrative agency is going to be the proper tribunal for handling commercial disputes between operators and their contract parties. They are charged with the responsibility of determining who gets to profit from video gaming. Do you agree with that? They do it every day. And as part of that, could they not pass a rule that says anybody who's denied an application is not allowed to profit indirectly by assigning a prior contract? Could they make that kind of rule? I don't think that they could do that categorically because there's all types of reasons why someone could be deemed unsuitable. Like if you don't have enough money to fund your operations or you don't. It's not always about that someone's a bad person or a bad guy. So I don't think they can categorically do that. But they do make that decision every day. But they're not doing it based on commercial disputes. They're doing it based upon the validity of an applicant, who those people are. That's what they're doing. Well, haven't they in effect done that by amending the rule to say effective July 15th or whatever it is, 2014? After that, agreements signed by a terminal operator who was not licensed at the time of the signing are not going to be honored. I mean, they're regulating it right now. Well, that's July 15th to 2014 into the future. It's not retroactively applied, and that was the problem. Why is that? Because the third district, instead of examining their jurisdiction, decided this case and the gaming board feels bound by the third district's decision. And maybe this all needs to get unwound and put in the jurisdiction of the gaming board, where it belongs, where whatever they do has statewide application. Well, I respectfully disagree with that, Your Honor. I'm sure you will. The triple 7 was, again, deciding the validity of the contract, and the argument there was that the pre-licensure agreement is prohibited by the Video Gambling Act. It's not. There's not a single provision in the Video Gambling Act that prohibits pre-licensure agreements. There's not a single rule of the IGB, in effect, that prohibited pre-licensure agreements. The evidence is uncontroverted that the IGB, in its administrative description, accepts pre-licensure agreements every day. They've done it since the beginning. It's in their application dating back to 2010. If they choose to change the rules for who can, what can be a use agreement going forward, that's one thing. But that's prospectively only. We're deciding these contracts were signed originally in 2010. They were signed in 2012. You can't apply an IGB rule retroactively, and the situation now is completely different than when the act was passed in 2009, and everyone in the industry, including Excel, ran around and got pre-licensure agreements. There are 73 terminal operators. There are 4,295 licensed locations. We've provided ample evidence that the IGB has always processed these pre-licensure agreements. They have always also processed and allowed assignments after the denial, when issuance of a notice of denial, but prior to the request for hearing. That's their practice and procedure. The reason we didn't ask the court, by the way, we didn't ask the court. These were made in a contested issue before the board, though. Is that right? Well, there's absolutely not a single piece of evidence that's brought to the record by Excel that the IGB has ever rejected a pre-licensure agreement because it's a pre-licensure agreement and has ever rejected an assignment simply because it was from a denied terminal applicant. They're making all their decisions based upon the suitability of who should be allowed to operate. They're not deciding the commercial aspects or whether there's a breach of contract and those types of things. There's no mechanism for it. But the impact, when I talk about retroactivity, the impact of a decision that all pre-licensure agreements are illegal is massive. And we didn't ask, by the way, Your Honor, we never asked the court to discern the intent of the IGB. We said there's nothing in the Video Gambling Act that precludes pre-licensure agreements. There's nothing in the IGB rules that precludes pre-licensure agreements. We remained an applicant at the time of the assignment. Excel intervened in this case and made a policy argument purporting to speak for the IGB that all of these things are invalid. First, they argued that the IGB, based on the IGB intent, all pre-licensure agreements are illegal. That is preposterous based upon what the IGB actually really does and has done since 2010. They made the argument also that the IGB's intent is that assignments of these agreements are completely illegitimate and unprocessable. They're the ones who brought up the intent. We actually argued that the statutes are clear. You don't even need to get into intent. But if you want to look at what the IGB's intent is and how it interprets the BGA, because that's the IGB's job, is to interpret what it's supposed to do under the BGA. According to Excel, from the beginning of time on the Video Gambling Act, the IGB has been accepting illegal gambling contracts, that every one of these pre-licensure agreements, including the one that they intervened in to get into this case, is an illegal gambling contract. And their argument is that the IGB, which is the sole administrative body charged with implementing and operating the Video Gambling Act, didn't recognize something that was illegal under the Act when it was put in their face hundreds and thousands of times. That's where the intent part of this came in in the first place. But from a legal perspective, the panel does not need to get into the intent of the IGB, because it's clear. The issue that we presented when we filed the lawsuit was, is the contract valid, is our assignment valid? Not one of the defendant locations said we breached the contract, said we couldn't assign the contract, objected to the contract, tried to terminate the contract, etc., etc. They didn't join this appeal. They're our contract party. Excel intervened because it came in and went in, and I'm not going to get into the details of our Cook County case, but they, except for this, they paid our manager $900,000 to go around to all these locations to interfere and get second agreements. So you can talk about money and motivation. They paid our manager of our LLC, Mr. Jason, around $900,000 to go around and steal these locations from us. Well, I don't think there's any doubt there must be a lot of money involved in this up there. Well, you know, I think it depends on the location you're on, but that's our dispute in Cook County. We wanted a simple declaration about whether we had a good contract or not with the locations. Not one of the locations has joined a single one of these arguments that Excel's making. They didn't join them in the trial court. They didn't appeal, and they're not here today. Well, okay, let me ask you a question about that. Sure. Just, you know, looking at the timeline of what happened here. Right. You had this agreement with Wilde. It was a sign, and I'm just looking at Wilde, but I think the others are pretty similar or whatever. Yeah. I mean, it was obvious there was an issue about who had a valid contract with Wilde because you actually filed this declaratory judgment action March 18, 2013. Wilde was not even licensed until October of 2013. So they'd already been sued. They knew there was a dispute, right? Yet, as I understand the way this went, when Wilde was asked who's your terminal operator, they said Excel. That may be perfectly accurate. I mean, you're telling me, you know, of all these license establishments, they never claimed you breached your contract. They were happy with you, et cetera, et cetera. They never terminated. Why didn't they say J&J's our terminal operator? Well, because Excel came in and interfered and told these locations that our agreements were invalid, unassignable, and that's just not true. That was the nature of their interference. They saw an opportunity based on our notice of denial. They went around and showed that to everybody and said, well, look, they got denied. They're done. That's not what the law is. We remained an applicant all the way until September, and there was a precedent in front of the IGB for allowing assignments, and there's nothing in the Video Gaming Act or the IGB rules that says to the contrary. You asked me if the IGB can issue a rule. They sure can, but then it has to be reviewed by JCAR for propriety. The first one they put out was retroactive. It was rejected. It applied to every gaming agreement that there was. Was it rejected? Were those rules rejected because of that rule, or was it, as Excel says in their brief, on another basis? Excel can argue whatever they want about the record, but the proceeding in front of JCAR is not part of this record. My feeling is that one of the reasons that the language completely changed and it had to have a date stamp on it, effective July 15, 2014, is because of this retroactivity problem. JCAR is around to make sure that administrative agencies don't run afoul of the Constitution and stay within their authority. Right now we don't have anything before us that tells us either way, I guess, why JCAR did that. But we do know that in the second version, what they did months and months later, they had to put a date in it. They had to say it's effective as of July 15, 2014. So, you know, the IGB is entitled to do whatever it wants. We can only make arguments, and our contract rights depend on the rules that are in place at the time that we enter into agreements, and that's the thing. But, again, we didn't bring in the IGB intent. We didn't challenge. We don't challenge the IGB's allowance of assignments. It's in our favor. We have nothing to challenge there. But they don't decide this commercial dispute between us and our location. Your very contract that you entered into with these establishments that you call a pre-licensure contract, on its own terms, says this whole contract's all subject to the regulations of the IGB, right? Well, it also says, in terms of retroactivity, it says if there's a change in the law in that provision in particular, it says if there's a change in the law, such as video gaming is now null and void or in effect, it's as of the effective date of the law. That's what our express language in our contract says. So, yeah, I mean, this entire enterprise is never deemed to be anything other than under the approval of the IGB in terms of installation and getting licensed, okay? I mean, that's why it's not a gambling contract. There was never any idea that anyone would do anything with a video gambling terminal unless and until the IGB says. But the issue here is could we assign our contract on the date that we did it? And we could. And that triple seven is correct in that regard. The law of contracts says that we are allowed to do it. The IGB, if you want to look at the IGB's intent, whether they thought we could do it, they allowed it. And doesn't that mean, though, I mean, if you follow that reasoning, that the IGB is then obligated by law to accept that contract whether they like it or not. They can't do anything about it even though they're. No, absolutely not. Because they have. Well, the whole thing here is that this assignment is a binding assignment. That's your position. But there's a difference, Your Honor, between deciding that some entire category of contract is illegal or some entire category of assignments is illegal, which is what Excel is arguing. And then on the other hand, doing what Excel does every day and deciding can Mr. Jones and Company A, are they suitable to operate? Okay. That's what the IGB does. Well, let me ask you then. Okay. So are you saying then that despite what the court said in 777, that you get under these contracts and they're determined under 777 to be valid contracts, binding. Could the IGB still say then, no, we're not going to let you install VGTs in this establishment under that contract? They could do it, but for one reason. They couldn't do it because they decided that pre-licensure agreements are invalid or illegal. That they cannot do because the Video Gambling Act doesn't give them that power. But they could certainly look to see who the people are involved and say, you're not suitable. You're not – we don't like this contract. They could have said to J&J, we don't believe that action gaming is good enough to have any participation at all, and we are not going to install the video gambling terminals at those locations. In other words, they could say, we're not going to honor this assignment. Well, yes, but not because it's an assignment. They would say, we're not – your chain of title comes from these people, and we don't think you should get anything from these people. We don't think those people should get paid anything. Remember that the terminal operator application – and this is a really important document, I think, because it's the first time that the IGB put anything out that sort of demonstrates what they thought they were doing under the Video Gambling Act. And that's in the Mule Barn Record starting at volume C01821. Section 8 requires every applicant to say who your locations are, who are your locations, who are you, how did you get the locations, who's getting paid, how much is getting paid, and show us all the agreements. Now, all the parties in this case – well, all the parties involved – Action Gaming did exactly that with the IGB. We followed all their rules. They knew everything that we did every step of the way. The only reason we're arguing about what the IGB actually did, Your Honor, is that they're arguing that the IGB intent is otherwise. That's the only reason we got into this whole thing in the first place about the IGB intent. They say – and our counterargument is if the Video Gambling Act was so strong and it clearly prohibited these agreements, the IGB would have said, you can't do that. You can't have a few licensure agreements. You can't assign these things. It's against the law. They could decide that on a policy basis, and they could put it into practice. That would be demonstrative of their intent. But we have their entire regulatory scheme, which is very copious, and it's acknowledged in their briefs that the IGB has a rigorous vetting process. But they're conflating the idea that the IGB is allowing Action Gaming to do something with their real argument is that all of these assignments are by category illegal. One is an administrative action. One is an issue of law that this Court can decide. This Court can decide that the Video Gambling Act allows and does not allow, and that's what Triple 7 did, and that's all that we were asking when we filed our case, and that's all that's before you, Your Honor. If they want to challenge the specific administrative decision of the IGB that you should not have allowed the transfer from Action Gaming to J&J, they are now going into the IGB's bailiwick, making that administrative call as to who is suitable. Who should be able to get paid anything is a question for the IGB when they're looking at a specific contract. But the category here, this case presents the issue exactly as it was in Triple 7. Is the prelicensure agreement prohibited by the Video Gambling Act? Is the assignment of the prelicensure agreement prohibited by the Video Gambling Act? The answer to those two questions is no. It's not prohibited. If you look back even at Excel's issues and notices of appeal on what the issues are presented, those are the issues. The issue is not when the IGB allow, and they don't actually argue that the IGB allow the transfer. They say the IGB was notified of the assignment and did nothing. Okay. If their issue was they want to have a referendum on what the IGB should or shouldn't do with respect to my client, that is an administrative activity. That is a petition for mandamus against the IGB for acting beyond their authority. That's how you challenge an action of the IGB. Okay. We agreed with the action of the IGB in allowing us to transfer an assignment. We had nothing to go to them to complain about. And there is no, again, I've said it a few times, but when you look, there's nothing in the Video Gambling Act that suggests that this court is deprived of jurisdiction or any of this decidability goes to the IGB. Counsel, you probably gathered we've got this issue in our minds about jurisdiction, and it's not been raised or it's not been briefed. We didn't mean to blindside you this morning, but so if you would like the opportunity to further present to brief this, we can, Sue Sponte, raise the issue of jurisdiction. So no one's no one's asked for that. But yeah, I think that's thank you, Justice Schwarm. That is a great suggestion because it's obviously hard on your feet here to talk to look at the cases that Justice Stewart mentioned and make a decision. But how much time would you like? You know, I'd say 14. Well, 14 days and 14 days. Well, excuse me. Can I make a suggestion? Sure. Why don't we let us talk this over? We'll enter an order. OK. And define the issues. Yeah, we'll follow your schedule if you want. And on any issues, that's another good suggestion. I wanted to just go through the whole premise of why of it's the bad guy argument, OK, that they argue that the bad guy because of some bad guys might get in. You should invalidate all these contracts. I mean, the intake and regulatory process, as we've already mentioned, is copious. We also know that the IGB specific to J&J was fully informed. And we also know that we have evidence of the record that the IGB has actually approved video handling terminals to be installed based upon agreements that were signed by Prestige Gaming, which is one of the related companies to Action Gaming that was also denied. They were allowed to install VGTs. So the IGB has decided. We argued this in our brief. The IGB, if they want to challenge that decision, the IGB has already decided whether we should be allowed to participate. But the participation is, again, a separate argument from whether all these agreements are illegal and whether all these assignments are illegal. And that is a very important point for me to address. Let me just check on a couple of issues. I wanted to. Sure. I think I may have, you know, I've touched on the impact of reversal. Thank you. Thank you, counsel. Excuse me, counsel. A couple of brief points. First, with respect to supplemental briefing, and we're certainly not adverse to that, but we'd ask that you lift the injunctions that's in place in the lower court and let our machines go back because they're the ones the IGB said would be there in the first place. Some of them are out pursuant to the injunctions that were entered below, the judgment below. So we would ask if you're going to allow that supplemental briefing, do you vacate the injunction and let us go back to the status quo? Second, as I listened to counsel's argument, first of all, he's going way beyond the record and specifically citing the things that this court struck from the record and some of the underlying cases already. So I suggest that the court, when it's looking at the issue, go back and actually look at the record because the support he's relying on isn't there. It was stricken. It's not part of it. Third, I want to go back to where I started my argument, which is the language of 1800, section 320. Counsel keeps talking about retroactivity. This isn't an issue of retroactivity. Because what the clarification by the IGB says, beginning on July 15, it's only between a licensed terminal operator, the beginning of July 15, 2014, is licensed by the board at the time of use agreement to sign. So on July 15, 2014, it's like a checkup for every agreement. Okay, everything's in place. Was it both people licensed at the time it was signed? It's no different than when the CLE requirements were imposed on lawyers. It's not that, oh, only lawyers who became licensed to practice law after that point in time had to comply with the CLE. Every lawyer had to comply with it. Same way under this regulation, every use agreement has to comply. Their argument is these weren't use agreements. Well, then we get back to that circular position. Right. So they would say that doesn't apply to these agreements because they're pre-licensure agreements. It would be to accept that position. At some point, the pre-licensure agreement has to become a use agreement or else you're never going to install a video gaming terminal. So as of whatever point, again, we don't buy this fiction that something that's invalid can become valid. But at some point, in order for it to be operational, let's call it space failure, to become operational, it has to be a use agreement. Because otherwise it's a pre-licensure agreement, which is an agreement to do nothing. Because it can't ever come into effect. At the moment, if you buy that fiction, at the moment it comes into effect, it's a use agreement, at which point it's triggered by Section 320, in which case it's out. Because these agreements weren't signed by a licensed terminal operator at the time they were signed. So, again, that's when we get back to the same place and the ultimate conclusion, which is these are bad. Next issue that I just want to kind of talk about, Mr. Gantz was talking about Excel didn't do this, Excel didn't do that. We're essentially a defendant. We're not trying to challenge an IGB ruling. To the extent the IGB said anything here, it approved us being there in the first place. It flipped the switch. It let the installation. It gave everyone the sign-off. So it's not incumbent on Excel to make any challenge because to the extent the IGB spoke, we're the ones who were there. But as I listen to the argument, it's almost said, well, Excel should have challenged this assignment. You should have challenged this. No, Excel didn't have to challenge it because the IGB held Excel's favor. And to Justice Stewart, your question to Mr. Gantz, when the terminal operator was asked, who's your contracting party, who's your operator, they said Excel. So even they recognized that they had contracts with Excel, and that was a valid agreement. If they didn't think they had a valid agreement, they would have said J&J, Action Gaming, ABC Gaming Company, someone else other than Excel. But they told their regulator that we were the ones that were supposed to be there. And now through getting through the court system, Action slash J&J is trying to undo that. Mr. Gantz says, well, it's not really a gambling contract. I mean, I've heard him say that. And it's a contract for the, I think he said, installation and operation of gaming equipment. That's like saying, OK, I'm going to contract with someone to engage in prostitution. And because it's just talking about the mechanics of prostitution and not the actual act of prostitution, it's not a prostitution contract. That's nonsense. A contract for putting gaming terminals in and operating gaming terminals, that's a gambling contract. The same way if I went to a prostitute and said I'll pay you X for Y, that's a prostitution contract. Either of them is bad. It's a matter of law. We've given you the case law and our brief that supports it. Essentially, this case is an issue of legislative intent. Excel, J&J from the get-go said we didn't have standing to even be here. Our rights are irrelevant. The fact that the IGB put us in there is of no course. Now they sit there and say, well, IGB decides something different or it's not up to that. They're trying to have it both ways. They're trying to end wrong what the IGB did, which furthers the legislative intent of the video gaming statute, which is keep people like them out. They shouldn't use the court to go in through the back door. Thank you. Thank you, counsel. We appreciate the briefs. Excuse me. In arguments, counsel will take this case under advisement. Court will be in a short recess and then resume oral argument. Thank you. All rise.